UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                  Criminal Case No. 22-20395

ROBERTO IVAN GOMEZ,          Sean F. Cox
                                            United States District Court Judge

    Defendant.
_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

In this criminal case, Defendant Roberto Ivan Gomez ("Gomez") is charged with Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. § 841(a)(1). The matter is before the Court on Gomez's Motion to Suppress Evidence, wherein he asks the Court to suppress evidence seized from an Uber ride-share vehicle that he was a passenger in when that vehicle was stopped by the police on April 19, 2022. The parties have briefed the issues and the Court held an evidentiary hearing, and heard oral argument, on May 9, 2023. For the reasons set forth below, Defendant's Motion to Suppress Evidence is DENIED.

**BACKGROUND**

The criminal charge in this case stems from a vehicle stop that occurred on April 19, 2022. On April 19, 2022, Defendant Gomez was a back-seat passenger in an Uber ride-share vehicle that was pulled over by the Michigan State Police ("MSP").

On February 24, 2023, Gomez filed a Motion to Suppress, asking the Court to suppress evidence that was seized from that Uber vehicle on April 19, 2022. (ECF No. 24). In his

1

motion, Gomez argued that the stop was invalid because the MSP trooper's justification was pretextual and not supported by probable cause. The Government responded that Gomez was validly stopped for a traffic infraction and that, in addition, there was probable cause to believe that illegal drugs were in the vehicle with Gomez based upon an investigation by the United States Drug Enforcement Agency ("DEA") and information that the DEA relayed to the trooper who conducted the stop.

With the issues so framed by the parties, this Court held an evidentiary hearing on the motion on May 9, 2023. At that hearing, the Government called two witnesses: 1) DEA Special Agent Matthew Grams; and 2) MSP Trooper Joshua Olszewski ("Olszewski" or the "Trooper"). The Government also introduced a video and audio recording from the MSP scout car that Olszewski was driving on the date in question. Defendant Gomez called one witness, Merhawi K. Meles, the Uber driver. Defendant did not introduce any exhibits at the evidentiary hearing.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard and observed the witnesses who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Special Agent Matthew Grams has been employed by the DEA since 2016. Prior to 2016, Grams was employed as a police officer in Wisconsin for eleven years.

Grams has worked in the Detroit field division office since joining the DEA. Grams conducts investigations of high-volume drug trafficking offenses. In that regard, Grams works

2

closely with the Michigan State Police, frequently using troopers with drug-detecting canines to assist with stops of vehicles and other searches.

Michigan State Trooper Joshua Olszewski joined the Michigan State Police in 2016. Since 2016, he has been involved in general road patrol and investigations involving large-scale narcotics. In April or May of 2021, he entered a training program to be a MSP canine unit. After extensive training with Olszewski, his canine partner, a German Shepard named Kai, was certified to detect four separate narcotics: 1) crack cocaine; 2) cocaine; 3) heroin; and 4) methamphetamine. Kai is not certified to detect fentanyl.

On April 19, 2022, Grams worked with Trooper Olszewski and his canine partner. Grams had the Trooper and Kai on stand-by in the event he needed to make a vehicle stop.

Grams had learned, through a confidential informant, that a drug courier was arranging for a multi-kilogram delivery of fentanyl. Through the confidential informant, the DEA was arranging for a controlled purchase of 4 kilograms of fentanyl. Grams kept other law enforcement officers aware of the information he learned, including Olszewski, as the investigation progressed.

During the investigation, the confidential informant spoke with the drug courier over the telephone, and spoke with another third party too. The confidential informant was given a cellular telephone number for the courier who was going to deliver the drugs. Grams ran that telephone number through the DEA's database and learned that it was a phone number that had previously been used by Gomez. Grams also learned that, at the end of March of 2022, another DEA investigation involved the arrest of Gomez who was using that same phone number. In connection with that investigation, Gomez had been arrested in New Jersey, following a vehicle

3

stop, and was found with three kilos of suspected fentanyl. Grams learned Gomez's full name and was able to obtain a photograph of Gomez, who is a Hispanic male.

The confidential informant told Grams that he was going to meet the drug courier at the Home Depot store in Farmington Hills, Michigan.

The DEA obtained a description of the drug courier from the confidential informant, who said he was a Hispanic male who was wearing a hat and carrying a backpack. The DEA then established surveillance at the Home Depot store in Farmington Hills. Grams was not part of that surveillance. Two other special agents handled that aspect of the investigation and gave Grams reports over the telephone and radio. These special agents had a photograph of Gomez. They reported to Grams that they saw a male matching Gomez's description get dropped off at the Home Depot store. But rather than enter the store, like an actual customer would, the man later determined to be Gomez, loitered in the area around the store entrance. This information was relayed to Grams and other officers over the radio.

Grams then had the confidential informant call Gomez and tell him to go to the Home Depot store in Southfield, Michigan for the delivery of the drugs.

A different vehicle, a Nissan Ultima, then came and picked up Gomez from the Farmington Hills Home Depot store. The special agents obtained the license plate number for the vehicle, determined it was an Uber ride-share vehicle, and that was relayed to the other officers over the radio.

Gomez got into the back seat of the Nissan Ultima, that was being driven by Meles. Meles is an Uber driver and he did not know Gomez prior to this date.

At this time, Grams still had Trooper Olszewski on standby. Grams planned to move the

drop-off location for the controlled buy, so that he could have the vehicle Gomez was riding in stopped before it reached the Home Depot store in Southfield.

Grams relayed details of the investigation to Olszewski, including that the controlled drug buy was for a purchase of fentanyl and that the quantity was expected to be about four kilograms. Grams relayed the description of the drug courier (a Hispanic male wearing a hat and carrying a backpack) to Olszewski, and also sent him a photograph of Gomez. Grams continued sharing information with the Trooper as the investigation progressed.

When Gomez got into the Uber car, Grams had reason to believe that Gomez had drugs with him, inside the backpack Gomez had with him inside the car, and relayed that to Olszewski.

After the Uber car left the Home Depot store in Farmington Hills, the officers continued their surveillance and unmarked cars followed the Uber vehicle.

The DEA agents told Trooper Olszewski that Gomez was mobile. Olszewski then drove his fully-marked scout car toward the Uber vehicle that was en route to the Southfield, Michigan Home Depot store. Grams told Olszewski that if he saw a traffic violation he could stop the Uber vehicle for that violation. But he stressed that the Uber vehicle should be stopped and searched in any event, even if there was no traffic violation observed by the Trooper.

Grams asked Olszewski to do the stop because he was part of a canine unit. Although Olszewski's canine partner is not trained to detect pure fentanyl, Grams still thought it would be helpful to have a canine search. That is because, in Grams's experience, sometimes drug buys end up with a different drug than the one ordered getting delivered. And other times, the drug is cut or mixed with other drugs like cocaine or heroin, and those drugs can be detected by the canine. Trooper Olszewski's experience likewise led him to believe that a canine search by Kai

could be helpful for these same reasons.

Grams received updates from Olszewski as he approached the Uber vehicle. Olszewski observed the Uber vehicle being driven by Meles fail to properly use his turn indicator as he merged onto the exit ramp for I-696. Olszewski advised Grams that the Uber driver failed to use his turn signal and that he was pulling the vehicle over.

The Trooper then turned on his scout car's lights and sirens, to pull the Uber vehicle over.

After the Uber vehicle was pulled over, Trooper Olszewski approached the front passenger window of it, and leaned his head and upper body into the car to talk to the driver. While doing so, he observed both Meles and Gomez inside the car. Gomez met the description of the drug courier that had been provided to Olszewski. The Trooper also observed that Gomez was visibly nervous, was shaking and breathing heavily, and would not make eye contact with him. Olszewski observed the backpack in the backseat and could also smell a strong odor of a substance like shampoo or conditioner inside the vehicle Olszewski knows, from his training and experience in narcotics, that drug traffickers often attempt to mask the odor of narcotics by placing them in packaging and then encasing the packages with such products.

Olszewski testified that most drivers are at least somewhat nervous when pulled over for a traffic stop, as they may be getting a ticket. He testified that it was unusual for a passenger in a ride-share vehicle to be so nervous during a traffic stop. It was suspicious to him that the passenger in this Uber vehicle, Gomez, was so nervous.

Olszewski identified himself to the driver, Meles, and asked for his driver's license, registration, and proof of insurance. Olszewski asked Gomez if he had his I.D. on him and

Gomez declined to produce it. He then asked Gomez his name and Gomez declined to tell the Trooper his name. Gomez's actions in declining to give him such basic information, especially while shaking, breathing heavily and avoiding eye contact with him, heightened the Trooper's suspicions about Gomez.

Olszewski asked Meles to step out of the vehicle so that it would be easier for them to hear each other. He advised Meles that he stopped his vehicle because he did not properly use his turn indicator. He asked Meles if he knew the individual in the back of the vehicle and Meles stated he was an Uber driver. The Trooper asked Meles if there is a reason why the passenger is so nervous. Meles said he picked his passenger (Gomez) up from a Home Depot and that he was "nice" and did not seem nervous to him.

The Trooper then asked, "is there anything illegal in the car?" and Meles said no and again stated he is an Uber driver. Olszewski then asked: 1) "so there's no narcotics in the car that would be yours?"; 2) "are there any weapons in the car I should know about?"; and 3) "there is nothing illegal in the car?" Meles responded no to each of those questions. He than asked Meles if he would be ok with him searching the vehicle and the Meles agreed and stepped in front of the patrol car.

The Trooper then asked Gomez to step out of the car and Gomez said "do I have to?" and the Trooper responded, "yes, you do."

After Gomez exited the vehicle, the Trooper asked him if he had anything illegal on him and if he minded if he searched him to see if he has anything illegal on him. Gomez agreed and the Trooper patted Gomez down. The Trooper found something in Gomez's pocket and Gomez told him the object was "a charger." Gomez stated he was coming from Home Depot. The

7

Trooper told Gomez the item in his pocket, that he had said was a charger, is actually a tracker and asked him why he had a tracker. The Trooper said, "that's kind of weird don't you think?" and Gomez said, "no, I use it for work."

Gomez having lied to him about the device in his pocket further heightened the Trooper's suspicions. That is especially so because Olszewski knows, from his experience with narcotics trafficking, that trackers are often used to track persons, vehicles, or shipments of drugs or drug proceeds. Thus, it was a "huge red flag" that Gomez had a tracker on his person and lied about what the device was.

The Trooper asked Gomez is there is anything illegal in the car he should know about and Gomez responded no. The Trooper than asked "nothing at all? No Cocaine? Heroin? Methamphetamine? Crack cocaine? Any weapons or anything like that?" and Gomez responded no.

The Trooper asked Gomez if he has any warrants or anything and Gomez said no. He asked Gomez if he is from Michigan and Gomez responded that he doesn't have to answer any questions. The Trooper had Gomez stand in front of the patrol car with Meles. The Trooper then patted down Meles and found nothing.

Gomez and Meles waited in front of the scout car while the Trooper talked to others on the police radio. The Trooper then came out with his canine partner and walked around the Uber vehicle. Kai did not alert to the presence of narcotics. Kai was then taken back to the scout car.

Olszewski testified that the fact that his canine partner did not alert to the presence of drugs did not surprise him or undermine his belief that there was probable cause that drugs were inside of Gomez's backpack in the vehicle. If the drugs being provided were pure fentanyl, the

canine would not alert to that, because it was not trained to alert for that. Moreover, Olszewski had already observed a strong smell of shampoo or conditioner coming from the backseat and knew, from experience, that such substances are often used to mask the odor of narcotics.

After returning his canine partner to the scout car, Olszewski returned to the Uber vehicle. At this time, both Gomez and Meles were standing in front of the scout car and were watching the Trooper. Olszewski first opened the front driver's seat door first and looked around. He then opened the rear driver's side door and grabbed the backpack from the passenger seat. Olszewski testified that the backpack had a heavy weight toward the bottom of it, and he felt a brick-like package. After Olszewski had already found the drugs in the backpack, Gomez said "you can't search that" to Olszewski. The Trooper told Gomez to turn around and then handcuffed Gomez.

## ANALYSIS & CONCLUSIONS OF LAW

It is undisputed that, as a passenger of the Uber vehicle, Gomez has standing to challenge the validity of the traffic stop at issue in this case. (*See* Govt.'s Br. at 5).

"In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). Here, Trooper Olszewski had both.

An officer may legally conduct a traffic stop of a vehicle if the officer has probable cause to believe that a traffic violation occurred. *United States v. Hughes*, 606 F.3d 311, 315-16 (6th Cir. 2004); *see also Bazzi v. City of Dearborn*, 658 F.3d 598, 604 (6th Cir. 2011) ("A traffic violation provides probable cause to justify a stop 'even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop.'"). And reasonable

suspicion to perform a traffic stop may ripen into probable cause to search a vehicle based on the officer's interactions with the vehicle's occupants. *Lyons*, 687 F.3d at 770-71.

Here, Trooper Olszewski observed the Uber driver fail to properly use his turn indicator, thereby allowing the Trooper to conduct a traffic stop for that violation. Thus, the Trooper could stop the Uber vehicle. The Trooper's subjective intentions are irrelevant. In other words, it "simply does not matter" whether the Trooper intended to stop the Uber vehicle on the basis of the traffic violation or instead intended to stop the vehicle because its passenger (Gomez) was suspected of having illegal drugs in his possession. *Hughes, supra.*

In addition, even if the traffic stop had not been supported by probable cause of a traffic infraction, it was still legal because Olszewski had reasonable suspicion that Gomez was involved in drug trafficking and had illegal narcotics with him in the Uber vehicle.

Police officers may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime. *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5,* 174 F.3d 809, 813 (6th Cir. 1999) (citation omitted). "The same Fourth Amendment test applies to vehicle stops." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)). As explained by the Sixth Circuit:

> "Reasonable suspicion" is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). It requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir.1998), *cert. denied*, 525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999).

*Houston*, 174 F.3d at 813. "Reasonable suspicion must be considered 'under the totality of the

circumstances, considering all of the information available to law enforcement officials at the time.'" *Lyons*, 687 F.3d at 763.

"It is well-established that an officer may conduct a stop based on information obtained by fellow officers." *United States v. Lyons*, 687 F.3d 754, 765 (6th Cir. 2012) (citations omitted). "Variously called the 'collective knowledge' or 'fellow officer' rule, this doctrine recognizes the practical reality that 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another.'" *Id*. (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)). As explained by the Sixth Circuit:

> Because officers "must often act swiftly [and] cannot be expected to cross-examine their fellow officers about the foundation of transmitted information," we impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop. *Id*. at 230–31, 105 S.Ct. 675; *see also Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion. *Dorsey*, 517 F.3d at 396; *Smoak,* 460 F.3d at 779. By imputing the investigating officer's suspicions onto the responding officer, without requiring the responding officer to independently weigh the reasonable suspicion analysis, the collective knowledge doctrine "preserves the propriety of the stop" and avoids crippling restrictions on our law enforcement. *United States v. Ibarra–Sanchez*, 199 F.3d 753, 760 (5th Cir. 1999).
>
> Despite its flexibility, the collective knowledge doctrine is not without its restrictions. The doctrine's primary boundary is, of course, the Fourth Amendment itself. As with any traditional investigative stop, a traffic stop based on collective knowledge must be supported by a proper basis and must remain reasonably related in its scope to the situation at hand. *See Davis*, 430 F.3d at 354. Accordingly, if an investigating officer "lacked sufficient information to satisfy the reasonable suspicion requirement, and the [responding officer's] subsequent observations did not produce reasonable suspicion," then the stop violates the Fourth Amendment. *Feathers*, 319 F.3d at 849. Likewise, if a responding officer exceeds the stop's scope because he was not provided with the facts necessary to stay within its proper bounds, then any evidence improperly obtained therefrom

> remains subject to the exclusionary rule, just as if the investigating officer committed the error. *See, e.g., United States v. Pineda–Buenaventura*, 622 F.3d 761, 776 n. 5 (7th Cir. 2010) (finding that the exclusionary rule "remain[ed] in play" when supervisors failed to communicate the proper bounds of a search warrant to executing officers). The taint of a stop effected without reasonable suspicion similarly cannot be cured by an after-the-fact relay of information. *See Blair*, 524 F.3d at 751–52. Applying traditional Fourth Amendment restrictions equally to the collective knowledge doctrine ensures that communications among law enforcement remain an efficient conduit of permissible police activity, rather than a prophylactic against behavior that violates constitutional rights.

*United States v. Lyons*, 687 F.3d at 766. There are three separate inquiries to be made in applying the doctrine: 1) "the officer taking the action must act in objective reliance on the information received;" 2) "the officer providing the information must have facts supporting the level of suspicion required;" and 3) "the stop must be no more intrusive than would have been permissible for the officer requesting it." *Id*. at 767.

Considering these principles, the collective knowledge doctrine applies to this case. This case presents facts very similar to those presented in *Lyons*, where the Sixth Circuit found that officers were entitled to reply on the collective knowledge doctrine.

Like the situation presented in *Lyons*, the DEA had been conducting an investigation of narcotics trafficking.

Grams had learned, through a confidential informant, that a drug courier was arranging for a multi-kilogram delivery of fentanyl. Through that informant, the DEA was arranging for a controlled purchase of 4 kilograms of fentanyl. The informant was given a telephone number for the courier who was going to deliver the drugs. Grams ran that telephone number through the DEA's database and learned it was a phone number that had previously been used by Gomez – who had been arrested in New Jersey, following a vehicle stop a few months earlier, and was found with three kilos of suspected fentanyl. Grams learned Gomez's full name and obtained a

photograph of Gomez, a Hispanic male.

The confidential informant told Grams that he was going to meet the drug courier at the Home Depot store in Farmington Hills, Michigan.

The DEA obtained a description of the drug courier from the confidential informant, who said he was a Hispanic male who was wearing a hat and carrying a backpack. The DEA then established surveillance at that store and reported seeing a male matching Gomez's description get dropped off at the Home Depot store and loiter around the store entrance, without entering the store.

After Grams had the confidential informant call Gomez and tell him to go to the Home Depot store in Southfield, Michigan for the delivery of the drugs, the Uber vehicle arrived and picked up Gomez. The agents obtained the license plate number for the vehicle, determined it was an Uber ride-share vehicle, and that was relayed to the other officers over the radio.

This information being discovered over the course of the investigation was relayed to Olszewski, who was asked to be on standby in order to conduct a vehicle stop.

Trooper Olszewski was not acting on his own initiative when he decided to stop the Uber vehicle. In other words, the Trooper had no independent reason to target the Uber vehicle; rather, he did so based entirely on Agent Grams's request that he do so. Like the officer in *Lyons*, the Trooper possessed all of the information he needed to stop and search the Uber vehicle at the DEA's direction. Trooper Olszewski had reasonable suspicion to believe that Gomez possessed illegal narcotics inside the Uber vehicle, justifying his stop.

Olszewski's reasonable suspicion then escalated, based on his own observations during the stop. When the Trooper leaned his head into the Uber vehicle, he observed a strong odor of a

substance like shampoo or conditioner, that he knows from experience is often used to mask the odor of narcotics.

While leaning into the vehicle, the Trooper also observed that Gomez, who despite being the passenger, was visibly nervous, was shaking, and breathing heavily.  Gomez also avoided eye contact with the Trooper and declined to answer basic questions.  Gomez also had a tracker device on his person, that Olszewski knows from experience is often used to track shipments of narcotics or proceeds from drug sales.  Gomez lied to the Trooper, telling him that it was a charger – despite the fact that the device was labeled as tracker.

The Trooper's observations during the stop, considered in their totality along with all of the facts that permitted the initial stop of the Uber vehicle, established probable cause to search the vehicle for controlled substances.[1]

## CONCLUSION & ORDER

For the reasons set forth above, the Court DENIES Defendant Gomez's Motion to Suppress Evidence.

IT IS SO ORDERED.

                                                s/Sean F. Cox
                                                Sean F. Cox
                                                United States District Judge

Dated:  May 19, 2023

---

[1] The lack of a positive alert from Olszewski's canine partner did not undermine the probable cause to search the Uber vehicle, in light of all of the circumstances presented here.  Among other things,  Kai is not trained to detect fentanyl, the drug that was expected to be delivered, and the drugs were encased in a substance commonly used to mask the odor of narcotics.